J-S09018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NIBRI WATSON | : | |
| | : | |
| Appellant | : | No. 727 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 5, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005670-2022

BEFORE:   LAZARUS, P.J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.:                                        **FILED JUNE 4, 2025**

Nibri Watson ("Watson") appeals from the judgment of sentence imposed by the Philadelphia County Court of Common Pleas ("trial court") following his convictions of first-degree murder, carrying a firearm without a license, carrying a firearm on the public street in Philadelphia, and possession of an instrument of crime.[1]  Watson raises a challenge to the sufficiency of the evidence to support his conviction based upon the alleged dearth of evidence to establish that he committed the murder, and claims that the trial court abused in discretion in permitting the introduction of biographical information from a prior arrest form.  Upon review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a)(1), 6106(a)(1), 6108, 907(a).

The trial court set forth the relevant underlying facts:

At around 8 p.m. on September 14, 2021, [Watson] was in the parking lot of Liberty Gas Station at 101 West Leigh Avenue in Philadelphia. N.T.[,] 2/1/[20]24[,] at 68, 71-72, 74; Commonwealth Exhibit C-57 (Surveillance Video Compilation). During the time [Watson] was in the parking lot of the gas station, three individuals, Kamaj Rudd [("Rudd")], Johnathan Dell [("Dell")], and an unknown third man, arrived at the gas station and went inside while [Watson] remained in the parking lot. N.T.[,] 2/1/[20]24[,] at 68, 74-75; Commonwealth Exhibit C-57 (Surveillance Video Compilation). Upon exiting the gas station, Rudd, Dell, and the unknown man approached [Watson] as he stood outside and robbed him at gun point. N.T.[,] 2/1/[20]24[,] at 17, 68, 76-77; Commonwealth Exhibit C-57 (Surveillance Video Compilation).

After robbing [Watson], the three men immediately fled, running away from the gas station towards North Howard Street. N.T.[,] 2/1/[20]24[,] at 68, 77; Commonwealth Exhibit C-57 (Surveillance Video Compilation). A few seconds after the three men started to run, [Watson], who had a gun concealed in his waistband, began chasing them. N.T.[,] 2/1/[20]24[,] at 68, 77-78; Commonwealth Exhibit C-57 (Surveillance Video Compilation). Once on North Howard Street, the three men who robbed [Watson] ran towards a black sedan. N.T.[,] 2/1/[20]24[,] at 68, 78-80; Commonwealth Exhibit C-57 (Surveillance Video Compilation). Two of the men, Dell and the unknown man, got into the sedan and quickly sped away from [Watson]. N.T.[,] 2/1/[20]24[,] at 68, 78-80; Commonwealth Exhibit C-57 (Surveillance Video Compilation). As the car sped off, [Watson], who had since drawn his gun, shot Rudd multiple times in the back after Rudd, who was lagging behind, tripped in his attempt to catch up to the car. N.T.[,] 2/1/[20]24[,] at 68, 78-80; Commonwealth Exhibit C-57 (Surveillance Video Compilation). After shooting Rudd, [Watson] fled the scene. N.T.[,] 2/1/[20]24[,] at 68, 80; Commonwealth Exhibit C-57 (Surveillance Video Compilation).

Following the shooting, medics and police promptly arrived at North Howard Street to find Rudd lying face down in a pool of blood on the sidewalk. N.T.[,] 2/1/[20]24[,] at 84-85. Rudd was assessed by medics and subsequently transported to Temple University Hospital, where he was pronounced dead during the

early morning hours of September 15, 2021. N.T.[,] 2/1/[20]24[,] at 89, 92. The medical examiner determined the cause of Rudd's death was multiple gunshot wounds, and the manner of death was homicide. N.T.[,] 2/2/[20]24[,] at 33-36. [Watson] was not licensed to carry a firearm on the date of the shooting. *Id.* at 36.

Trial Court Opinion, 6/6/2024, at 2-3.

Police arrested Watson and charged him with numerous crimes. The matter proceeded to a jury trial. Pertinently, at trial, the Commonwealth introduced a compilation video that contained footage from surveillance cameras near the scene of the robbery and shooting. The video showed the shooter to be left-handed. As a result, the Commonwealth sought to introduce into evidence Watson's Pennsylvania criminal history, which compiled biographical information from Form 75-229,[2] and showed that Watson was left-handed. Watson's counsel objected to the introduction of this evidence, arguing the Commonwealth did not provide it during discovery and the biographical information could not be admitted because Watson had not been provided with *Miranda*[3] warnings when this information was taken. The trial court rejected both of Watson's claims and admitted the evidence.

_____

[2] Form 229 is a biographical information report completed after an individual is arrested. Form 229 collects basic information about the arrestee, including the person's name, address, date of birth, and other relevant details. In this case, the information presented was derived from a 229 form completed after Watson was arrested as a juvenile.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

The jury ultimately found Watson guilty of the above-mentioned crimes. The trial court sentenced Watson to an aggregate term of life in prison. Watson filed a timely appeal, raising the following claims for our review:

1.    Where the Commonwealth's case relied solely upon video and cell phone evidence, and the video evidence reflected that [Watson's] skin tone and facial features were different than that in the videos, was the evidence insufficient as a matter of law to identify [Watson] as the doers [sic] of these crimes?

2.    Where the Commonwealth sought to admit a booking statement which only provided to the defense at trial, did the lower court improperly reward the Commonwealth for its misconduct by not finding that the Commonwealth lack of notice and the prejudicial nature of this evidence did not warrant its exclusion from trial?

3.    Where the booking statement contained evidence which incriminated [Watson] and was not general information, did the lower court err in not concluding that [Watson's] statement to the police was inadmissible due to a lack of **Miranda** warnings?

Watson's Brief at 3.

## Sufficiency of the Evidence

Watson argues the evidence was insufficient to support his convictions because the Commonwealth failed to prove he committed the crimes. **Id.** at 8, 13.  He contends that the Commonwealth's evidence relied on two people —his stepfather, Darryl Taylor ("Taylor") and Detective Thorsten Lucke. **Id.** at 9, 10.  Regarding Detective Lucke, Watson claims that he "superimposed an allegedly known photo of Watson against that of the person in a composite video at the Liberty Gas Station." **Id.** at 9.  According to Watson, "the known

photo superimposed on the video inside the Liberty Gas Station, reflects a skin color and a nose which are far different from the known photo of the person who the Commonwealth claims is Watson." *Id.* He further highlights that Taylor never definitively identified the person in the photograph as Watson. *Id.* at 10-11; *see also id.* at 11 (asserting that "Taylor was by no means certain whether the photographs he was shown by the police on December 5th were the same ones that were shown to him in court"). He additionally argues that evidence showing his cell phone to be in the area of the shooting is not dispositive because the person using it did not look like Watson. *Id.* at 11-12. Watson claims that this Court can review the video of the shooting and determine whether the evidence was sufficient to support his convictions. *Id.* at 12.

Watson also rebuts the Commonwealth's suggestion that he was wearing distinctive clothing, noting that he was wearing a popular Adidas sweatsuit. *Id.* at 12; *see also id.* (observing that in the Commonwealth's "five-minute video compilation there are four separate people wearing the same Adidas track pants").

We review Watson's challenge to the sufficiency of the evidence pursuant to the following standard:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient

- 5 -

> to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

*Commonwealth v. Scott*, 325 A.3d 844, 849 (Pa. Super. 2024) (citation and brackets omitted).

The only aspect of the convictions that Watson challenges is the finding that he was the perpetrator of the crimes. As such, a discussion of the elements is unnecessary. As it pertains to identification evidence, the law is clear that "evidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. Williams*, 255 A.3d 565, 579 (Pa. Super. 2021) (citation omitted). Further, "[a]lthough common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be considered to establish identity in conjunction with other circumstances and identification testimony." *Id.*

The record reflects that at trial, the Commonwealth presented a compilation video of the shooter's movements and actions prior to and during the shooting that resulted in Rudd's death. *See* N.T., 2/1/2024, at 68; Commonwealth Exhibit C-57 (surveillance video compilation). The video showed that on September 14, 2021, around noon, an individual wearing Adidas sweatpants with three stripes and a white emblem, a white shirt, and

a light-colored wristband on his left wrist was seen at the gas station. N.T., 2/1/2024, at 72-73; Commonwealth Exhibit C-57; ***see also*** N.T. 2/1/2024 at 29; Commonwealth Exhibits C-61 & C-61A (photographs of the shooter). The compilation showed a photograph of Watson to compare to the individual in the video. N.T., 2/1/2024, at 73. The video then jumps ahead to the time of the shooting, which occurred around 8:00 p.m. ***Id.*** at 72, 74. Three individuals, including Rudd, appear in the video and approach an individual wearing a white shirt, adidas pants, and a light-colored wristband on his left wrist. ***Id.*** at 75-76; ***see also id.*** at 76 (the individual is holding a phone to his left ear). The three men robbed the individual, and fled the scene. ***Id.*** at 76-77. The individual then chased after the men and shot Rudd multiple times in the back, killing him. ***Id.*** at 77-80.

Taylor testified that he is Watson's stepfather and has known him for over fifteen years. ***Id.*** at 10-11. A police detective showed Taylor two photographs of the shooter and Taylor stated the individual in one photograph "looks like [Watson]." ***Id.*** at 30, 31; ***see also*** Commonwealth Exhibit C-59 (Body Cam Video of Taylor's statements). In the other photograph, Taylor indicated he could not see it clearly but it "could be [Watson]." N.T., 2/1/2024, at 30.

Additionally, the Commonwealth presented testimony from Detective Robert Daly, who conducted an analysis of Watson's cell phone. N.T., 2/2/2024, at 38. Detective Daley indicated that he had received a phone

number associated with Watson from another detective on the case. ***Id.*** at 38-40; ***see also id.*** at 39 (both parties stipulated that the phone number in question was attributed to Watson). He testified that on September 14, 2021, between approximately 11:00 a.m. and 11:30 a.m., Watson's phone traveled from the area of his home to the area around Liberty Gas Station. ***Id.*** at 48-49. Watson's cell phone records indicated that phone calls were made at approximately 12:15, 12:30, and 12:55 p.m. that day. ***Id.*** at 49-52. Notably, Detective Daly compared the timing of the calls to the gas station surveillance video and found the shooter holding up a phone to his ear at those times. ***Id.*** at 50-52. Detective Daly testified that Watson's phone returned to the Liberty Gas Station area at around 7:30 p.m., just before the shooting, and left the area after the shooting. ***Id.*** at 53-55.

Contrary to Watson's assertion, there was significant circumstantial evidence establishing that he shot and killed Rudd. ***See Williams***, 255 A.3d at 579. The jury was able to compare the video and photographs of the shooter and Watson to establish the identity of the shooter. Any uncertainty in Taylor's identification of Watson from the photographs "is a question of the weight of the evidence, not its sufficiency." ***Commonwealth v. Edwards***, 229 A.3d 298, 307-08 (Pa. Super. 2020) (citation omitted); ***see also Commonwealth v. Kinney***, 157 A.3d 968, 972 (Pa. Super. 2017) (noting that a claim that the identification was "unconvincing" and "vague" attacks the credibility of the witness, and, as such, challenge the weight of the

evidence).[4] Additionally, the cell phone data from Watson's phone showed the shooter's movements were consistent with the location of the phone. Thus, we conclude the evidence was sufficient to identify Watson as the shooter.

Accordingly, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence the Commonwealth presented at trial was sufficient to sustain Watson's convictions. **See Scott**, 325 A.3d at 849; **Williams**, 255 A.3d at 579.

## Admissibility of Evidence

Watson's final two claims relate to the trial court's admission of information gathered during a prior arrest, when he was a juvenile, which established he was left-handed. Our standard of review is as follows:

> In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

**Commonwealth v. Thompson**, 106 A.3d 742, 754 (Pa. Super. 2014) (citations and quotation marks omitted).

### Discovery Violation

---

[4] To that end, Watson does not cite to any place in the record where he raised a weight challenge before the trial court. **See** Pa.R.Crim.P. 607.

Watson first argues that the trial court abused its discretion in failing to exclude the contents of "a juvenile 229 Form, a booking statement which reflected that Watson is left-handed." Watson's Brief at 13.[5] According to Watson, this evidence was critical to establish the Commonwealth's case that he was shooter, as the prosecution mentioned the fact he was left-handed repeatedly during closing arguments. *Id.* He notes that his counsel objected to the admission of the evidence because the Commonwealth failed to provide the form during discovery. *Id.* at 13, 14. Watson claims that had the

Commonwealth provided the form to him, he could have filed a motion to suppress or motion in limine to exclude the form. *Id.* at 14. Watson disputes the trial court's finding that he did not establish he was prejudiced by the admission of the form, noting that the fact of left-handedness was significant evidence to establish identity. *Id.* at 14-15.

It is well settled that discovery in criminal cases is governed by Pennsylvania Rule of Criminal Procedure 573. In discovery violations cases, our standard and scope of review are as follows:

_____

[5] We note that the Commonwealth did not introduce the 229 form at trial, but rather introduced Watson's biographical information from his Pennsylvania criminal history. The parties, however, do not dispute that the information included in his criminal history was derived from Watson's 229 form, which was completed after he was arrested as a juvenile. *See, e.g.,* N.T., 2/2/2024, at 9-10, 15, 19-20. As Watson's claims of error are premised on the admission of the information contained in the 229 form, not the introduction of his criminal history at trial, and is limited to allegations of discovery and *Miranda* violations, we will so confine our analysis.

- 10 -

> If a discovery violation occurs, the court may grant a trial continuance or prohibit the introduction of the evidence or may enter any order it deems just under the circumstances. The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. Our scope of review is whether the court abused its discretion in not excluding evidence pursuant to Rule 573(E). A defendant seeking relief from a discovery violation must demonstrate prejudice. A violation of discovery does not automatically entitle appellant to a new trial. Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure.

*Commonwealth v. Brown*, 200 A.3d 986, 993 (Pa. Super. 2018) (citations and quotation marks omitted).

Here, the Commonwealth sought to introduce biographical information compiled from Watson's Form 229, including his height, weight, prior addresses, and the fact he is left-handed. N.T., 2/2/2024, at 9-10, 15, 19-20. The record confirms that Watson's counsel objected because this criminal history was never provided as part of discovery. *Id.* at 13-15, 16. The trial court rejected Watson's claim, noting that although the Commonwealth committed a discovery violation, Watson did not suffer prejudice. *Id.* at 19-20, 26. Subsequently, the trial court permitted the admission of the requested information. *Id.* at 58 (Commonwealth Exhibit C-63 (Philadelphia Police Criminal History)). Detective Daly testified that the document is produced in the normal course of business and the information is obtained at the time of arrest. N.T., 2/2/2024, at 58-59.

There is no dispute that the Commonwealth failed to provide the document during discovery. *See id.* at 13-16. We find no abuse of discretion

in the trial court's determination; however, Watson failed to demonstrate prejudice. ***See Brown***, 200 A.3d at 995. At the hearing, Watson was unable to articulate any prejudice other than the "incriminating nature" of the evidence. N.T., 2/2/2024, at 23. He made no argument before the trial court that his trial strategy would have been different if the information had been provided to him prior to trial. ***See Brown***, 200 A.3d at 995 (concluding that appellant must demonstrate how timely disclosure would have affected trial strategy or how he was otherwise prejudiced); ***see also Commonwealth v. Santiago-Burgos***, 314 A.3d 535, 544 (Pa. Super. 2024) (noting "[e]vidence will not be prohibited merely because it is harmful to the defendant") (citation omitted). We therefore conclude that his claim is without merit.

### *Miranda*

Watson also contends that the evidence was inadmissible because the information was incriminating and should have been preceded by ***Miranda*** warnings. Watson's Brief at 13-14, 16. Although he concedes that biographical information is not subject to ***Miranda*** warnings, Watson argues that the fact that he is left-handed is not information typically contained in standard booking forms. ***Id.*** at 16-17. Watson concludes that the issue of his left-handedness was testimonial evidence as it was a means of identifying him as the shooter and therefore falls outside of the biographical information exception. ***Id.*** at 17-18.

"To invoke the Fifth Amendment privilege against the forced provision of information, a defendant must show (1) the evidence is self-incriminating; (2) the evidence is compelled; and (3) the evidence is testimonial in nature." ***Commonwealth v. Davis***, 220 A.3d 534, 543 (Pa. 2019). "[G]eneral information such as name, height, weight, residence, occupation, etc. is not the kind of information which requires ***Miranda*** warnings since it is not information generally considered as part of an interrogation." ***Commonwealth v. Garvin***, 50 A.3d 694, 698 (Pa. Super. 2012) (citation omitted). "Such questions are not calculated to, expected to, or likely to elicit an incriminating response, or asked with the intent to extract or an expectation of eliciting an incriminating response." ***Id.*** (citation, quotation marks, brackets, and ellipses omitted). In fact, contrary to Watson's argument, we have expressly held that "there is no requirement that a suspect be advised of any ***Miranda*** rights where the police seek biographical, general information for completion of a Form 75–229." ***Id.*** at 689-99.

Watson's claim is without merit. He fails to establish that the information obtained to complete the form, including that he was left-handed, was created for investigative or prosecutorial purposes at the time of its collection such that this case requires a different conclusion than we reached in ***Garvin***. As the record here reflects, the information was collected in the ordinary course of administration. N.T., 2/2/2024, at 58-59. Therefore, the

trial court did not abuse its discretion in admitting the evidence.  ***See Garvin***,

50 A.3d 694, 698.

Judgment of sentence affirmed.


Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


Date: 6/4/2025